IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TERESA L EDRICH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-02963-E |
| | § | |
| DALLAS COLLEGE, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Dallas College's motion for summary judgment, which seeks summary judgment on all of Plaintiff Teresa Edrich's claims. (ECF Nos. 17, 18). Edrich has responded, (ECF Nos. 22-24), and further moved for leave to file limited additional briefing, (ECF No. 31). Having carefully considered the motions; the Parties' briefing; appendices; and the applicable law, for reasons that follow, the Court grants Dallas College's motion for summary judgment and denies the remaining motion for leave.

### I.   BACKGROUND

#### A.  Edrich's Work at Dallas College

This case involves disputes over employment and breach of contract. Dallas College is an undergraduate institution that operated several, separately accredited colleges, including Brookhaven, Cedar Valley, Eastfield, El Centro, Mountain View, Northlake, and Richland. (ECF No. 19-5 at 2). Edrich, a White woman, began work at Dallas College in 1994 as a payroll specialist at Brookhaven College. (ECF No. 19-1 at 11, 42; ECF No. 19-3 at 61; ECF No. 19-4 at 8). Edrich worked at Brookhaven for twenty-six years, and Dallas College promoted her several times. (ECF

No. 19-1 at 10-14). In 2007, Dallas College promoted Edrich to Executive Director of Human Resources at Brookhaven. (ECF No. 19-1 at 11, 16-17). In 2018, Dallas College changed Edrich's official title to Executive Administrator. (ECF No. 19-1 at 14-15).

### B.  Dallas College's Phased Consolidation of Human Resource Positions

In February 2020, Dallas College hired Sherri Enright, a White woman, to serve as its Chief Human Resources Officer. (ECF No. 19-1 at 18; ECF No. 19-2 at 4; ECF No. 19-3 at 4). At that time, Dallas College's chancellor, Dr. Joe May, announced the consolidation of the seven separate Dallas College colleges into one accredited institution with separate campuses, known collectively as Dallas College. (ECF No. 19-1 at 18). As a part of this consolidation, Enright "was responsible for creating the new structure for Human Resources." (ECF No. 19-3 at 2). This restructuring resulted in consolidation of human resources[1] positions. (ECF No. 19-3 at 2-3). The HR restructuring involved two phases—a "transitional" phase and a "final" phase.

### C. Transitional Phase of HR Restructuring and Edrich's HR Service Center Assignment

Prior to any restructuring, Dallas College had twelve Executive Administrators—seven of whom led HR functions at the seven campuses and five of whom held other roles in HR administration; this group was comprised of seven males and five females—of whom seven were Black, three were White, and two were Hispanic. (ECF No. 19-1 at 18-20). In April 2020, Enright "rolled out her proposal of the various work teams" during the transitional phase of the HR restructuring, which required various HR employees—including Edrich—to report to Enright. (ECF No. 19-1 at 18-19). During the transitional phase, each of the twelve Executive Administrators were reassigned to serve different functions. (ECF No. 19-1 at 19-20). Dallas

---

[1] When used colloquially, the Court refers to "human resources" as "HR."

College reassigned former Executive Administrators—who, like Edrich, were based at a single campus and had authority over a wide range of HR matters—to oversee specific functions across the entire Dallas College organization. (ECF No. 19-1 at 17-20).

In Spring 2020, Enright reassigned Edrich to lead the HR Service Center—"a one-stop shop for information." (ECF No. 19-1 at 20). Such a concept did not exist prior to the restructuring. (ECF No. 19-1 at 20). Edrich described her perspective on the HR Service Center as: "chaotic[—][t]o manage it was chaotic because I didn't know what the expectations were. It was brand new to the district, the function, or to Dallas College, so when no one can describe to you what it is they have in mind, it is just a shot in the dark." (ECF No. 19-1 at 20). During Edrich's work at the HR Service Center, then-Executive Vice Chancellor Justin Lonon, General Counsel Rob Wendland, and other senior leaders "had called [Enright] and complained about or raised concerns about a variety of responses coming out of the HR Service Center team or a perceived lack of helpfulness." (ECF No. 19-2 at 11). Enright explained:

> Those people raised issues and concerns with respect to the [functional] are over which [Edrich] was responsible, yes. . . . [Edrich] [had] been working from home. . . . [T]here were concerns raised with a variety of the response, for instance, that had come out of the HR Service Center. There were concerns about whether that area was appropriately answering questions and concerns and being as resourceful as needed. . . . **The concerns were about the responses and—and performance of the HR Service Center that were first raised to my attention in the spring of 2020 and continued through spring and summer and probably into the fall.**

(ECF No. 19-2 at 11) (emphasis added in bold). Other Dallas College employees complained to Enright about "lack of . . . helpfulness, lack of proactiveness, [. . .]the inconsistency in responses, and the—a general overall feeling that [the HR Service Center] team was not functioning in the manner in which it was intended." (ECF No. 19-2 at 12). Enright received complaints that the HR Service Center delayed in answering inquiries or failed to answer inquiries. (ECF No. 19-2 at 12).

Enright experienced instances in which Edrich failed to respond to e-mails related to the HR Service Center. (ECF No. 19-2 at 13).

### D.  Final Phase of HR Restructuring

Two changes occurred with the Executive Administrators in August 2020. First, none of the Executive Administrators' contracts—including Edrich's—were renewed for a one-year period as of August 2020. (ECF No. 19-2 at 10). Instead, the Executive Administrators proceeded under a month-to-month contract after the end of August 2020. (ECF No. 19-2 at 10). Edrich's month-to-month contract was renewed automatically, unless Dallas College or Edrich provided a notice of termination of employment or termination of contract ten days prior. (ECF No. 19-2 at 10-11; ECF No. 19-1 at 50). Edrich's month-to-month contract did not guarantee Edrich any particular position, job description, or job duties. (ECF No. 19-1 at 50).

Second, Enright announced "that [Dallas College's] current positions as [E]xecutive [A]dministrators were being eliminated and would be replaced with newly developed leadership positions, resulting in fewer positions in Dallas College's human resources operations." (ECF No. 19-1 at 21). Enright had developed an HR structure with five separate functional areas, each with a corresponding "Senior Director" position. (ECF No. 19-3 at 2). Thus, whereas the old HR structure had twelve "Executive Administrators," the final HR structure would have five "Senior Directors,"—one for each of the following Dallas College organization-wide specific functions: (i) HR Service Center; (ii) Talent; (iii) Total Awards; (iv) Workforce Planning; (v) and HR Systems and Strategy. (ECF No. 19-1 at 22).[2] Dallas College used a "talent pool" to identify and interview candidates for these five Senior Director HR positions. (ECF No. 19-3 at 2).

---

[2] The Parties refer to these five positions as "Senior Director" and "Director" positions, interchangeably. (*See* ECF No. 19-1 at 22; ECF No. 18 at 27). For consistency, the Court refers generally to each of these five positions as "Senior Director" positions.

> Three executives of the College agreed to be on the interview panel for the HR talent pool: **Rob Wendland** (General Counsel, White, then age 62), **Patty Arrellano Tolotta** (then Chief Marketing Officer, Hispanic, then age 51), and **Eddie Tealer** (then President of Eastfield College, Black, then age 55).

(ECF No. 19-3 at 2) (emphasis added in bold). "The interview panel interviewed all of the candidates and provided their feedback to [Enright]." (ECF No. 19-3 at 2). Enright further interviewed every candidate in the talent pool. (ECF No. 19-3 at 2).

Edrich applied for and ranked her interest in the Senior Director positions as: (i) HR Service Center; (ii) Talent; (iii) Total Awards; and (iv) Workforce Planning. (ECF No. 19-1 at 23; ECF No. 19-3 at 18). Edrich did not apply for the Senior Director of HR Systems and Strategy position. (ECF No. 19-1 at 23; ECF No. 19-3 at 18). Edrich had two interviews with Dallas College on her application. (ECF No. 19-1 at 23). Edrich described the first interview with Wendland, Tealer, and Tolotta as "okay" and "a challenge"—partially because she knew her interviewers. (ECF No. 19-1 at 24). Edrich described her second interview with Enright as "not get[ting] a positive feeling from [Enright] for the interview." (ECF No. 19-1 at 25).

Ultimately, on November 4, 2020, Dallas College notified Edrich that it did not hire her for any of the positions she applied. (ECF No. 19-1 at 25). Enright told Edrich that Edrich was "not the right fit for her team." (ECF No. 19-1 at 25). Nevertheless, Edrich and Enright discussed Edrich's continued work at Dallas College in a transition role for November 2020 as the manager of the HR Service Center. (ECF No. 19-1 at 25). Dallas College changed Edrich's job title—along with the other Executive Administrators who were not hired as one of the five Senior Directors—to "Interim Transition Manager." (ECF No. 19-1 at 30, 32-35). During her role as an Interim Transition Manager, Dallas College paid Edrich the same salary as before. (ECF No. 19-1 at 32, 38).

---

MEMORANDUM OPINION AND ORDER

### E. Edrich's Termination

During Enright's November 4, 2020, discussion with Edrich, Enright discussed a second talent pool for further HR positions. (ECF No. 19-1 at 27-28). On November 5, 2020, Enright announced the creation of a second talent pool for HR positions under the new Senior Directors. (ECF No. 19-1 at 27-28).[3] Edrich did not apply for any of the HR positions in this second talent pool. (ECF No. 19-1 at 29). In January 2021, Enright finalized the selections for the remaining HR positions from the second talent pool. (ECF No. 19-3 at 4). On February 9, 2021, Enright called Edrich to inform her that her month-to-month contract would not be renewed. (ECF No. 19-1 at 16). Enright testified Edrich was terminated solely because "[Edrich] did not participate in the subsequent many talent pools [. . .] and did not seek a role [. . .] her employment would not move forward." (ECF No. 19-2 at 13).[4]

### F. Procedural History

On February 25, 2021, Edrich filed a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission (TWC). (ECF No. 19-1 at 54-60). Edrich's charge asserted (i) discrimination based on age and color and date(s) of discrimination of November 4, 2020 to February 8, 2021; Edrich did not mark the discrimination as "continuing action." (ECF No. 19-1 at 54-55). *Inter alia*, Edrich's charge provides the following summarization:

> I had been a human resources professional at Dallas College ([sic] formerly the Dallas County Community College District for 25 years when a restructure was announced, and the position I held, HR Executive Administrator for Brookhaven

---

[3] The Parties refer to this second talent pool as the "mini talent pool." (*See, e.g.*, ECF No. 19-3 at 4).

[4] Edrich testified as to this nonrenewal in her deposition:

> [Question]: Did you believe that this nonrenewal of that monthly contract was unlawful?
> [Edrich]: No.

(ECF No. 19-1 at 16).

> College, was eliminated. Of the 12 executive administrators, only four similar positions would remain, and all were filled with African American hires, and all but one younger than I am and all with far less experience. I have also been discriminated against in Dallas Colleges' failure to fulfill of its contract obligations, in disparate pay, implied employment and unfair hiring practices[.]

(ECF No. 19-1 at 55).

Edrich first filed claims against Dallas College in Texas state court and later timely amended those claims after she received her right-to-sue notices from the EEOC and TWC. (ECF No. (ECF No. 1-1 at 10-19, 62-72). Dallas College timely removed to federal court. (ECF No. 1). Edrich's live pleading is her amended complaint, (ECF No. 5), wherein she asserts claims of (i) breach of contract; (ii) race, color, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and Chapter 21 of the Texas Labor Code (referred herein as the Texas Commission on Human Rights Act or "TCHRA");[5] and (iii) age discrimination in violation of the Age Discrimination in Employment Act (ADEA). (ECF No. 5 at 7-8).

On February 3, 2023, Dallas College moved for summary judgment to dismiss all of Edrich's claims. (ECF Nos. 17, 18). Edrich responded to Dallas College's motion for summary judgment, (ECF Nos. 22, 23), and Dallas College replied, (ECF No. 25). On July 7, 2023—123 days after Edrich's summary judgment response was due, after extension—Edrich further moved to file additional material relating to the motion for summary judgment relating to affirmative action. (ECF No. 31). However, the Court declines to consider such material as (i) Edrich's motion for leave is far out of time; (ii) Edrich's pleadings mention no facts or claims relating to affirmative action; (iii) Dallas College's motion for summary judgment is not based on

---

[5] The Court recognizes that the Commission on Human Rights has been replaced with the Texas Workforce Commission's civil rights division. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 798 n.1 (Tex. 2010) (citing TEX. LAB. CODE ANN. § 21.0015). Throughout this memorandum opinion and order, the Court refers to Texas Labor Code Chapter 21 as the TCHRA.

any affirmative action; and (iv) although Edrich makes passing reference to affirmative action in her response, Edrich fails to brief affirmative action as applied to the facts, claims, and circumstances of this case. Thus, Edrich's motion for leave is DENIED. (*See* ECF No. 31). Otherwise, having been fully briefed, Dallas College's motion for summary judgment is ripe for adjudication.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense

---

MEMORANDUM OPINION AND ORDER                                           Page **8** of **30**

to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) *submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense*, or (2) *arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. Celotex*, 477 U.S. at 322–25(emphasis added). There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see generally Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (quoting *Fontenot*, 780 F.2d at 1194) (discussing affirmative defenses).

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). When a plaintiff fails to defend a claim in response to a summary judgment motion, the claim is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff abandoned her retaliatory abandonment claim when she failed to defend the claim in response to a motion to dismiss); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983)

(explaining that a plaintiff, "in his opposition to a motion for summary judgment cannot abandon an issue and then ... by drawing on the pleadings resurrect the abandoned issue.").[6]

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.... "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

### III.   EDRICH'S BREACH OF CONTRACT CLAIMS

Under Texas law, the elements of a breach of contract claim are:

(1) a valid contract exists;
(2) the plaintiff performed or tendered performance as contractually required;
(3) the defendant breached the contract by failing to perform or tender performance as contractually required; and

---

[6] *See, e.g., Cantu v. Freedom Mortg. Corp.*, No. 3:19-CV-01701-B, 2021 WL 356840, at *2 (N.D. Tex. Jan. 4, 2021), report and recommendation adopted, No. 3:19-CV-01701-B, 2021 WL 351409 (N.D. Tex. Feb. 2, 2021); *see also Scales v. Slater*, 181 F.3d 703, 708 n. 5 (5th Cir. 1999) (plaintiff abandoned claim by failing to contest defendant's arguments for dismissal of that claim); *Gray v. Wal-Mart Stores Tex., LLC*, 2020 WL 7327994, at *4 (N.D. Tex. Nov. 6, 2020) (Rutherford, J.), *rec. adopted*, 2020 WL 7322737 (N.D. Tex. Dec. 11, 2020) ("Because Plaintiff has offered no evidence raising a material fact issue as to any element of her ... claim—indeed, she has not responded or offered any evidence [at] all—the Court finds that Plaintiff has abandoned her claim....").

---

(4) the plaintiff sustained damages due to the breach.

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). As pled and briefed, Edrich asserts Dallas College breached (i) her month-to-month contract—beginning September 1, 2020—and (ii) the "policies or codes" of Dallas College as it related to a grievance procedure. (ECF No. 23 at 12-13). The Court next addresses these two assertions.

### A. Whether Dallas College Breached Edrich's Month-to-Month Employment Contract

Dallas College argues it breached no part of Edrich's employment contract. (ECF No. 18 at 36-38). In response, Edrich avers Dallas College demoted her without notice—that this demotion constituted a breach of her employment contract. (ECF No. 23 at 12).

The record contains Edrich's month-to-month employment contract—which provides, in pertinent part:

> Dallas College has approved your employment as an Administrator, **subject to assignment within the District** for September 1, 2020 through September 30, 2020 (the "Initial Term"). **Upon the expiration of the Initial Term, or any renewal term, your employment with Dallas College will automatically renew for a one (1) month period ("Renewal Term"), unless, not less than ten (10) days prior to the last day of the applicable Term, either party gives the other party written notice of its intent not to continue the employment relationship.** During any Renewal Term, the terms, conditions and provisions set forth in this contract shall remain in effect unless modified in a writing signed by a duly authorized representative of Dallas College. **You understand and agree that Dallas College is undergoing a reorganization and restructuring during which all administrative positions are subject to review.** Should you be notified prior to the last day of the applicable Term, as set forth above, of the termination of your employment this contract will terminate at the end of the then current Term and will not be renewable for any time thereafter. **You do not have an expectation of, or right to, employment beyond the Initial Term, nor any Renewal Term.**

(ECF No. 19-1 at 50) (emphasis added in bold). This month-to-month employment contract refers to Edrich as an "Executive Administrator" and "Administrator." (ECF No. 19-1 at 50).

Edrich argues that she was demoted when Dallas College "switched her to a staff position, with no notice to her." (ECF No. 23 at 12). Edrich refers to the Court to her declaration, which states:

> [M]y August 2020 contract stated that I was an "Executive Administrator," and repeated that I was serving as an "Administrator." . . . My current record, however, shows that my last position was an "interim transition manager," which is a staff position, not administrator. A true and correct copy of that record is attached hereto as Exhibit 7. This change was made without notice to me, and was effectively a demotion, which I would have to explain to a future employer. Going from Executive Director to interim transition manager is obviously a step down, from administrator to staff[.]

(ECF No. 24-1 at 4). As for this demotion argument, Edrich directs the Court to no other evidence. (ECF No. 23 at 12).

Edrich argues—in conclusory fashion—that her job title changing from "Executive Administrator" or "Administrator" to "interim transition manager" was an "obvious" demotion. (ECF No. 24-1 at 4). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Thus, Edrich's declaration that Dallas College "obvious[ly]" demoted her is not competent summary judgment evidence. Notwithstanding, no evidence in the record shows any change to the terms of Edrich's work after Edrich's month-to-month employment agreement took effect—until February 9, 2023, when Enright notified Edrich that her employment would not be renewed.[7] It is undisputed that Dallas College continued to pay Edrich her same salary. Edrich

---

[7] Dallas College provided notice to Edrich of nonrenewal in excess of what was agreed. Edrich's employment contract required "not less than ten [] days" of notice prior to the end of the applicable month-to-month term. (ECF No. 24-1 at 4). For February 2021, Edrich's employment contract would have renewed on February 28, 2021. Enright noticed Edrich of Dallas College's nonrenewal on February 9, 2021—nineteen days before the end of February 2021.

---

MEMORANDUM OPINION AND ORDER                                            Page **12** of 30

otherwise provides neither argument nor refers the Court to evidence of any breach of the express terms of her employment contract.[8] Thus, the Court must conclude that no genuine issue of material fact exists as to whether Dallas College breached Edrich's month-to-month employment contract.

### B. Whether Dallas College Breached Its Policies Relating to Grievances

Regarding whether Dallas College breached its policies, Dallas College first argues that (i) governmental immunity protects Dallas College from such alleged breaches of policy; (ii) even if governmental immunity did not apply, Dallas College's policies were not incorporated into Edrich's employment contract (and therefore do not serve as terms of the contract). (ECF No. 18 at 38-49). In response, Edrich only avers that Dallas College breached its policies relating to her grievance. (ECF No. 23 at 13). In reply, Dallas College argues that there is no evidence that Edrich followed the grievance procedure. (ECF No. 25 at 25-26).

Under Texas law, governmental immunity removes a court's subject matter jurisdiction from suit. *See Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *see also Powell v. Greenville Indep. Sch. Dist.*, 2010 WL 3359620, at *2-3 (N.D. Tex. June 24, 2010) (Ramirez, J.), *rec. adopted*, 2010 WL 3359618 (N.D. Tex. Aug. 20, 2010). It is undisputed that Dallas College is a governmental unit, entitled to governmental immunity. *See, e.g.*, *Taylor v. El Centro Coll.*, No. 3:21-CV-0999-D, 2022 WL 102611, at *4 (N.D. Tex. Jan. 10, 2022) ("Dallas

---

[8] Although Edrich's pleadings assert a breach of contract relating to "business and travel funds," (ECF No. 5 at 7), (i) no evidence in the record contains any agreements regarding business or travel funds and (ii) Edrich completely fails to brief such allegations in her response. (*See* ECF No. 23). Thus, to the extent Edrich sought to pursue such allegations as breaches of contract, Edrich has abaondoned those claims. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983).

College enjoys governmental immunity from suit unless immunity is waived.").[9] Regarding governmental immunity, the Texas Local Government Code provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a *contract* subject to this subchapter *waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.*

Tex. Loc. Gov't Code Ann. § 271.152 (emphasis added). However, such a waiver of immunity only applies to:

> (A) a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity; []

Tex. Loc. Gov't Code § 271.1519(2)(A) (defining "contract"). As pled and briefed, Edrich relies on "policies" that are not pursuant to a written contract. *See Mohamad v. Dallas Cnty. Cmty. Coll. Dist.*, No. 3:10-CV-1189-LBF, 2010 WL 4877274, at *3 (N.D. Tex. Oct. 5, 2010), *report and recommendation adopted*, No. 3:10-CV-1189-L, 2010 WL 4883436 (N.D. Tex. Nov. 30, 2010). Furthermore, Edrich completely fails to respond to Dallas College's governmental immunity argument. (*See* ECF No. 23). Therefore, the Court must conclude that there has been no waiver of governmental immunity relating to Edrich's corresponding contractual claim(s). *See generally Black*, 461 F.3d at 588 n.1; *Hargrave*, 710 F.2d at 1164.

Dallas College's governmental immunity notwithstanding, Edrich's complained-of grievance policies cannot substantiate a breach of contract under these circumstances. "Under Texas law, employee handbooks or policy manuals merely constitute guidelines for the employment relationship and *do not create an employment contract unless they contain language*

---

[9] *See Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 297 (5th Cir. 2021) ("Texas governmental immunity, unlike constitutional sovereign immunity, applies to the state's political subdivisions, including junior college districts"); *Williams v. Dall. Cnty. Cmty. Coll. Dist.*, 2015 WL 13742548, at *5 (N.D. Tex. Feb. 4, 2015) (Godbey, J.).

*that specifically expresses an intention to be bound by the terms of the policy*." *Black v. Dallas Cnty. Cmty. Coll. Dist.*, No. 3:15-CV-3761-D, 2016 WL 915731, at *7 (N.D. Tex. Mar. 10, 2016) (internal citations omitted, emphasis added); *see, e.g.*, *McFarland v. Dallas Indep. Sch. Dist.*, No. 3-08-CV-2066-P, 2009 WL 10704740, at *4 (N.D. Tex. July 15, 2009) ("Texas courts have determined that there is no private cause of action for an entity's failure to follow its own rules.") (collecting cases). Here, there is no evidence that Dallas College intended to be bound to its grievance policies as a part of the employment contract with Edrich. Thus, the Court must conclude that no genuine issue of material fact exists as to Edrich's corresponding contractual claim that Dallas College breached its grievance policies, as no evidence shows Dallas College entered such an agreement.

Last, even if the Court assumes *arguendo* that (i) governmental immunity does not apply and (ii) Dallas College agreed to be bound by its grievance policies, no genuine issue of material fact remains on Edrich's grievance-related breach of contract claim. Edrich directs the Court only to the following evidence from her declaration regarding her grievance: "I attempted to bring a grievance through my attorney in February 2021, but I was ignored." (ECF No. 24-1 at 4). Edrich attaches the grievance policy. (ECF No. 24-1 at 30-32). The grievance policy provides:

> PRESENTATION **Initial presentation of a grievance must be in writing on a grievance form and must specify reasons for the grievance**. All supervisors will give an employee a full opportunity to present a grievance without fear of coercion or reprisal.
>
> An attorney or other representative of a grievant may present a grievance **to the appropriate supervisor** at any time during this grievance procedure.

(ECF No. 24-1 at 30-31) (emphasis added in bold). However, the record contains no evidence that Edrich presented her grievance in writing, as required by the policy; instead, Edrich confirmed she did not "submit any documentation initiating a grievance." (ECF No. 19-1 at 40). Instead, Edrich

---

MEMORANDUM OPINION AND ORDER                                    Page **15** of **30**

testified in her deposition that her counsel, Frank Hill "reached out to Mike Buchanan on [her] behalf." The record is devoid of evidence that Mike Buchanan was Edrich's supervisor.[10] The record contains no evidence that Dallas College failed to follow its grievance policies. Thus, assuming the above *arguendo*, the Court must conclude Dallas College did not breach any contractual term relating to its grievance policies.

The Court concludes there is no genuine issue of material fact as to Edrich's breach of contract claim(s). There is no evidence on at least one element of Edrich's claim that Dallas College breached her month-to-month employment contract, and there is no evidence on at least one element of Edrich's claim that Dallas College breached its policies. Additionally, the Court has concluded above that Dallas College is entitled to governmental immunity as to Edrich's claims that Dallas College breached its policies. For those reasons, the Court GRANTS Dallas College's motion for summary judgment on Edrich's breach of contract claims.

## IV.  EDRICH'S EMPLOYMENT DISCRIMINATION CLAIMS

Because several of Edrich's claims allege discrimination, the Court provides the following framework analysis, which is common to employment discrimination claims. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination.") (collecting cases). "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see, e.g., Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

---

[10] It is unclear from the record what role Mike Buchanan held.

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption.... It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002), *cert. denied*, 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's *production* of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. 133, 142, 120 S.Ct. 2097 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[13] Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817).

---

MEMORANDUM OPINION AND ORDER

**A.  Edrich's Discrimination Claims Under Title VII and the TCHRA**

Edrich asserts, in parallel, several claims of discrimination on multiple bases under (i) Title VIII and (ii) the TCHRA. "[T]he purpose of Title VII is to protect employees from their employers' unlawful actions." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 667 (5th Cir. 2020), cert. denied, 209 L. Ed. 2d 125, 141 S. Ct. 1382 (2021) (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011)); *see* 42 U.S.C. § 2000e, *et seq.* Like Title VII, the TCHRA serves to protect employees from their employers' unlawful actions. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 474 (Tex. 2001) (explaining that one of the TCHRA's purposes is to provide for the execution of the policies of Title VII.).[11] "When used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability. . . . Similarly, the law governing claims under the TCHRA and Title VII is identical." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 at n.2 (5th Cir. 1999).[12] Thus, as the proofs for these parallel claims are identical, the Court analyzes each of these claims together.

At the outset, the Court recognizes that Edrich's pleadings raise claims of discrimination based on race, color, and national origin. However, Edrich testified that the evidence that supports each of those three bases as "[a]ll in one bucket." (ECF No. 19-1 at 41). Edrich's pleadings do not set forth independent factual allegations supporting separate race, color, and national origin employment discrimination claims. (*See* ECF No. 5). Dallas College's briefing acknowledges

---

[11] The Texas Supreme Court has explained that claims asserted under the TCHRA should be analyzed in the same manner as its federal analogues. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) (citations omitted) ("Because one of the purposed of the TCHRA is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA."); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (noting the *McDonnell Douglas* burden shifting analysis applies to TCHRA disability discrimination cases); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (discussing disability discrimination under the TCHRA as parallel to the ADA).

[12] *See, e.g., Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) ("The substantive law governing Title VII and TCHRA retaliation claims is identical.")

---

these factual and procedural circumstances and refers to all three of these bases under Title VII

and TCHRA collectively as "race." (ECF No. 18 at 26-36). In response to these challenges of her

Title VII and TCHRA claims, Edrich refers only to her "race" discrimination claim. (ECF No. 23

at 8-11).[13] Edrich refers the Court to no independent evidence regarding discrimination based on

color or national origin. (*See* ECF No. 23). Thus, the Court pretermits independent discussion of

discrimination based on color or national origin as subsumed by Edrich's race discrimination

claim—as the Parties have both briefed.

Under Title VII, "*it shall be an unlawful employment practice for an employer--to

discharge any individual*, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, *because of* such individual's *race*,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Edrich directs

the Court to no direct evidence of race discrimination. (ECF No. 23 at 8) ("The Defendant has ably

stated the standard of review, and applicable law, so far as it goes. Plaintiff disagrees not with the

recitation of the *McDonnell Douglas* analysis[.]") Thus, the Court proceeds with the three-step

*McDonnell Douglas* framework. *See Owens*, 33 F.4th at 825.

Absent direct evidence of race-based discrimination, Edrich must make a prima facie

showing under the *McDonnell Douglas* framework that she

> **(1)** is a member of a protected group; **(2)** was qualified for the position at issue;
> **(3)** was discharged or suffered some adverse employment action by the employer;
> and **(4)** was replaced by someone outside [her] protected group or was treated less
> favorably than other similarly situated employees outside the protected group.

*Offord v. City of Fulshear*, 861 F. App'x 536, 541 (5th Cir. 2021) (internal quotation omitted)

(emphasis added in bold) (addressing claims under both Title VII and the ADEA); *see Autry v.

Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346–47 (5th Cir. 2013) (addressing failure to promote

---

[13] Indeed, the terms "color" and "national origin" do not appear anywhere in Edrich's briefing. (*See* ECF No. 23).

claims asserted under Title VII); *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 201 at n.3 (5th Cir. 2008) ("We evaluate claims of race discrimination under § 1981 using the same analysis as those under Title VII.").

It is undisputed that the only adverse employment action Edrich complains of—as pled and briefed—is Dallas College not hiring her for a Senior Director position.[14] Dallas College challenges the second and fourth elements of Edrich's prima facie case for race discrimination— (i) whether she was qualified for the Senior Director positions she applied and (ii) whether Edrich was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. In response, Edrich summarily refers the Court that "[t]here is no evidence that she was not qualified" and that Edrich "was qualified for these positions, or has at least raised a fact issue as to whether she was." (ECF No. 23 at 8, 10).

Regarding whether Edrich was qualified for the Senior Director positions she applied to, it is undisputed that Edrich worked in HR at Brookhaven for several years. However, it is also undisputed that (i) the Senior Director positions were new positions that Enright created and (ii) these new positions involved specific HR "functional areas" over the seven combined Dallas College campuses. (ECF No. 19-3 at 2). Therefore, the record shows the new Senior Director positions were different from the work Edrich performed before the restructuring. (ECF No. 19-1 at 10-17, 20, 22; ECF No. 19-2 at 11-13). After Edrich took lead of one of the related positions— at the HR Service Center during the transitional phase of the HR restructuring—the record shows

---

[14] Indeed, Edrich testified that the ultimate nonrenewal of her month-to-month contract in February 2021 was not unlawful:

> [Question] Did you believe that this nonrenwal of that monthly contract was unlawful?

> [Edrich] No.

(ECF No. 19-1 at 16).

Edrich performed poorly. (*See, e.g.*, ECF No. 19-1 at 20; ECF No. 19-2 at 11-13). Indeed, Edrich concedes in her briefing that she was "unable to make this brand-new function, in a brand new work environment, go smoothly immediately." (ECF No. 23 at 4). Although Edrich's declaration avers she "responded" to "concerns and problems" and "never failed to respond to an email or call" while working at the HR Service Center, such evidence does not controvert the evidence that Edrich delayed in responding. (ECF No. 24-1 at 3). Furthermore the competent evidence in the record shows Edrich's work at the HR Service Center was the *only* time Edrich worked at a College-wide HR function—with all prior work at Dallas College occurring at solely at Brookhaven College. (ECF 19-3 at 3; ECF 19-4 at 7).[15] Notwithstanding the above, the record shows Edrich only holds an associate's degree in "baking/pastry" from El Centro College. (ECF No. 19-1 at 7; ECF No. 19-4 at 8). Edrich testified she attended no other college or institution and held no certifications or licenses apart from her associate's degree. (ECF No. 19-1) at 7.

In light of the record, the Court concludes Edrich was not qualified for the new Senior Director positions. The Court pretermits discussion of the fourth element of a prima facie race discrimination claim as unnecessary. Thus, the Court concludes Edrich has failed to make a showing of a prima facie race discrimination claim under Title VII and the TCHRA. Accordingly, the Court GRANTS Dallas College's motion for summary judgment as to Edrich's race discrimination claim—and subsumed color and national origin discrimination claims, as briefed.

---

[15] Edrich's declaration provides "[m]y years at Dallas College were not limited to overseeing HR on a single campus. My experience included overseeing multiple campuses simultaneously along with coaching and mentoring other HR Directors." (ECF No. 24-1 at 3). However, such a general statement of fact is not specific to create a genuine issue for trial. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

**B. Edrich's Age Discrimination Claim under the ADEA**

"Under the ADEA, '[i]t shall be unlawful for an employer to fail or refuse to hire ... any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (quoting 29 U.S.C. § 623(a)(1)); *see generally Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Again, Edrich offers no direct evidence on her ADEA age discrimination claim, so the burden-shifting framework articulated in *McDonnell Douglas* applies. *Goudeau*, 793 F.3d at 474 (applying *McDonnell Douglas* framework to ADEA age discrimination claim). A prima facie ADEA case of failure to hire or promote consists of evidence that the plaintiff:

> **(1)** was within the protected class and was adversely affected; **(2)** was qualified for the position; and **(3)** the job remained open or was filled by someone younger.

*Lindsey v. Prive Corp.*, 987 F.2d 324, 326–27 (5th Cir. 1993) (emphasis added in bold). Here, the challenged positions regarding failure to hire or promote are the Senior Director positions.

Again, Dallas College challenges that Edrich was not qualified for a Senior Director position. Both Parties jointly brief the qualification elements of Edrich's respective race and age discrimination claims. Here, the Court concludes that Edrich was not qualified for a Senior Director position under the ADEA context as discussed above in the Title VII and TCHRA context. The Court pretermits further discussion of whether Edrich made a prima facie showing of age discrimination as unnecessary. Thus, the Court concludes Edrich has failed to make a showing of a prima facie age discrimination claim under the ADEA. Accordingly, the Court GRANTS Dallas College's motion for summary judgment as to Edrich's age discrimination claim.

### C.  Pretext

As determined above, Edrich has failed to direct the Court to evidence that would create a genuine issue of material fact as to her race discrimination claims under Title VII and the TCHRA and her age discrimination claim under the ADEA. Edrich has failed to make out a prima facie case for discrimination and retaliation as required and the burden does not shift to Dallas College. *See, e.g., Haynes v. Pennzoil Co.*, 207 F.3d 296, 301 (5th Cir. 2000) (ending its analysis and affirming district court's grant of summary judgment after concluding plaintiff "failed to establish a prima facie case of racial discrimination under Title VII"); *Owens,* 33 F.4th at 835 (applying the *McDonnell Douglas* framework to a retaliation claim under Title VII and 42 U.S.C. § 1981). Nevertheless—assuming *arguendo* that Edrich met her burden to show a prima facie case—Dallas College produced evidence of a legitimate, non-discriminatory, and non-retaliatory reason for not hiring Edrich as a Senior Director.  *Owens*, 33 F.4th at 835 (discussing pretext in the discrimination context); *see Moss*, 610 F.3d at 923 (discussing pretext in age discrimination context). Here, DISD produced evidence of one overarching reason Edrich was not hired as a Senior Director: Dallas College sought to hire the "most qualified" candidates, and other candidates were more qualified than Edrich to serve those Senior Director positions. (ECF No. 19-2 at 14).

Next, under the third step of the *McDonnell Douglas* framework, Edrich must counter Dallas College's evidence—of hiring the most qualified candidate and thereby not hiring Edrich— with "substantial evidence" that this reason was pretextual. *See Owens*, 33 F.4th at 825; *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (discussing pretext). "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

---

i.      *Pretext as to Edrich's Claims of Race Discrimination*

For pretext in the discrimination context, the Fifth Circuit has explained:

> The plaintiff must rebut each nondiscriminatory reason articulated by the employer. *Wallace*, 271 F.3d at 220. **A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence."** *Id.; Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (addressing discrimination claims under Title VII and the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978) (emphasis added in bold). "Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct." *Vaughn*, 665 F.3d at 637. "The similarly situated employee is known as a comparator." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (addressing gender discrimination claim under Title VII).

The Court must first acknowledge that Edrich's briefing as to pretext in the context of race discrimination is sparse—without a single citation to law. (ECF No. 23 at 11-12). Nevertheless, Edrich first argues that Dallas College's reason for not hiring Edrich—instead, hiring the most qualified candidate(s)—was false or unworthy of credence because Edrich was just as qualified. Regarding comparative qualifications in the pretext context, the Fifth Circuit has explained:

> A plaintiff can demonstrate pretext through evidence that she was "'**clearly better qualified' (as opposed to merely better or as qualified)" than the chosen employee**. *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995); *accord Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 412 (5th Cir. 2007). To meet her burden to show that she was clearly better qualified, **the plaintiff "must present evidence from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'** " *Moss*, 610 F.3d at 923 (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)).

*Roberson-King v. Louisiana Workforce Comm'n, Off. of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (emphasis added in bold).[16] "Showing that two candidates are similarly qualified does not establish pretext under this standard." *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002). And, "*[e]mployers* are generally free to weigh the qualifications of prospective employees, so long as they are not motivated by race." *Martinez v. Tex. Workforce Comm'n-Civil Rights Div.*, 775 F.3d 685, 688 (5th Cir. 2014) (emphasis added).

As discussed above, the record does not support that Edrich was qualified for the Senior Director position(s). Notwithstanding that determination, Edrich refers to her experience, tenure, good performance reviews, and responses to interview questions to support that she was "clearly better qualified." (ECF No. 23 at 11). Such evidence does not meet the "high bar" under this pretext standard. *See Roberson-King*, 904 F.3d at 381; *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019) (discussing the same as to comparative qualifications). As discussed in *Price*, work experience, and longer tenure with an employer do not establish that an employee is clearly better qualified than another. *Price*, 283 F.3d at 723; *see Nichols v. Lewis Grocer*, 138 F.3d 563, 568–69 (5th Cir. 1998) (explaining that losing applicant's longer tenure and more varied work experience with the company did not make her "clearly better qualified" than the winning applicant). Furthermore, the record shows that whereas Edrich held only an associate's degree in baking/pastry, each of the hired candidates held masters degrees— two of whom held masters degrees relating to HR. (ECF No. 19-5 at 2; ECF No. 19-3 at 52). Edrich avers in her declaration that "Dallas College had long recognized equivalencies to advanced degrees"—attaching the corresponding equivalencies. (ECF No. 24-1 at 3, 15-16). But when

---

[16] "The bar, however, is set high for this kind of evidence." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019) (emphasis added) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922–3 (5th Cir. 2010)).

compared with Edrich's education and work history, no evidence in the record shows that Edrich

met any of those equivalencies. (*Compare* ECF No. 19-1 at 7, *with* ECF No. 24-1 at 15-16). Edrich

has not met her burden to show she was clearly more qualified than the candidates employed as

Senior Director. *See, e.g.*, *Martinez*, 775 F.3d at 688 (holding that plaintiff had not shown he was

clearly more qualified where he had more supervisory guidance, higher-level experience, more

years in role, and more education); *Price*, 283 F.3d at 723 (same where plaintiff had college degree,

greater management experience, and other qualifications).

Edrich next argues Dallas College did not hire her because Dallas College sought to hire

Black people in the Senior Director roles. (ECF No. 91-1 at 42; ECF No. 23 at 11).[17] However,

Edrich directs the Court to no evidence in support of this argument. To the contrary, the record of

Edrich's deposition provides:

> [Question] What evidence do you have that you were not hired because of your race?
> [Edrich] No evidence other than what has already been submitted.
>
> [Question] And just so I'm clear. The fact that the two individuals who were hired for -- I'm sorry -- the three individuals who were hired for the slots that got filled of the four that you applied for, all three were African American?
> [Edrich] Correct.
>
> [Question] **Other than the fact that the ultimate candidates were Black, do you have any other evidence to support your claim that that's why you were not selected?**
> [Edrich] **No**.
>
> [Question] **Did anybody say anything to you about race --**
> [Edrich] **No.**
>
> [Question] **-- in connection with the talent pool?**
> [Edrich] **The only thing that was said to me was I wasn't a right fit for her team.**

---

[17] Edrich's briefing refers to the "talent pool" "hiring only African-Americans," but the record and Edrich's references do not refer to the hires as "African-American," only "Black." (*See, e.g.*, ECF No. 19-1 at 46).

(ECF No. 19-1 at 42) (emphasis added in bold). Edrich nevertheless refers the Court to testimony from Enright's deposition that Dallas College "strove to have our employee base mirror the community" to show a discriminatory animus. (ECF No. 23 at 11). Not only is that statement not specific evidence that creates a genuine issue of material fact, Edrich's implied factual inference that "the community" equates to "African-Americans" or Black people is wholly unsupported by the record. (*See* ECF No. 23 at 11). Upon review of the record, there is no evidence that Dallas College hired those other candidates because they were Black. To the contrary, the record shows that the talent pool panel member(s) and Enright "did not consider the applicants' race, color, national origin, [or] age . . . in the decisions" in hiring Senior Directors. (ECF No. 19-3 at 3). Again, Edrich has not met her burden to show Dallas College's reason for not hiring Edrich—instead hiring the most qualified candidates—was false or unworthy of credence.

Edrich last argues examples of "more favorable treatment" of non-white employees, but Edrich's pretext analysis fails to grapple with the correct standard for showing pretext in the race discrimination context of "disparate treatment"—which occurs where an employer treats one employee more harshly than other "similarly situated" employees for 'nearly identical' conduct. *Vaughn*, 665 F.3d at 637. Nevertheless, Edrich refers the Court to evidence regarding the changing of work titles to substantiate pretext, but no evidence in the record shows such changes in titles constituted "more harsh[]" treatment. (ECF No. 23 at 11-12). Edrich refers to her testimony that the change in her work title was an "obvious[] . . . step down," but Edrich fails to substantiate such an alleged fact with any competent evidence, and the Court has found none. (ECF No. 23 at 11-12). Edrich appears to argue George Marquez, Jessye Andrews, and Vickie Montgomery as similarly situated comparators, but no competent evidence in the record shows those individuals were similarly situated. First, the record shows Marquez "was transferred out of the HR department

and to the Office of Social Responsibility where he reported to a different supervisor." (ECF No. 13-3 at 3); *see Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 237 (5th Cir. 2015) (explaining that not sharing the same supervisor makes a proffer of a comparator "insufficient for [that] reason alone). Second, no competent evidence shows Andrews and Montgomery were similarly situated.[18] It is further undisputed that none of the former Executive Administrators who worked at a single campus—including Edrich—were hired into a Senior Director role out of the talent pool. (ECF No. 19-1 at 35).

For those reasons, the Court must conclude Edrich has failed to carry her burden to show pretext on her race discrimination claim—either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Laxton*, 333 F.3d at 578. The Court must conclude the record contains no "substantial evidence" of pretext as to Edrich's race discrimination claim. *Owens*, 33 F.4th at 825.

### ii.     Pretext as to Edrich's Claim of Age Discrimination

For pretext in the ADEA discrimination context, the Fifth Circuit has explained "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), *that age was the 'but-for' cause of the challenged employer decision*." *Moss*, 610 F.3d at 922 (internal citation omitted, emphasis added); *see also Goudeau*, 793 F.3d at 474–75 (discussing the same).[19] Thus, Edrich must show by a preponderance of the evidence that Dallas College's reason

---

[18] The only reference Edrich makes to Andrews and Montgomery regarding similarity is Edrich's own, entirely conclusory statement that they "had positions very similar to mine at Dallas College." (ECF No. 24-1 at 4). Such a conclusory statement is not competent summary judgment evidence. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

[19] In *Goudeau*, the Fifth Circuit explained:

"Under the ADEA, the employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Squyres v. Heico Co., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Reeves*, 530 U.S. at 143,

---

for not hiring Edrich—because Dallas College hired the most qualified candidates—was pretext for discrimination; instead, Edrich must show that age was the but-for cause for not hiring Edrich.

Edrich fails to brief pretext as to her age discrimination claim under the ADEA. (*See* ECF No. 23). Edrich directs the Court to no evidence that age was the but-for cause of Dallas College not hiring her as a Senior Director. In other briefing regarding her qualifications, Edrich avers generally that "[t]wo of the candidates were repeatedly described with words that sound like code for "younger": proactive[,] passion[,] very excited[,] enthusiasm[,] [sic] new ideas." (ECF No. 23 at 10) (internal citations omitted). Even if the Court were to liberally construe such briefing as applied to a pretext analysis of age discrimination, the record does not support Edrich's argument that such descriptions amount to evidence of age discrimination. Indeed, the record is devoid of evidence that age was the but-for cause of Dallas College not hiring Edrich as a Senior Director.

Thus, the Court must conclude Edrich has failed to carry her burden to show pretext on her age discrimination claim. *Moss*, 610 F.3d at 922. The Court must conclude the record contains no "substantial evidence" of pretext as to Edrich's age discrimination claim. *Owens*, 33 F.4th at 825.[20]

## V.    CONCLUSION

For the reasons enumerated above, the Court GRANTS Dallas College's motion for summary judgment on all of Edrich's claims. The Court DENIES Edrich's motion for leave. The Court shall enter a final judgment by separate filing.

*(Signature Page Follows)*

---

120 S.Ct. 2097). The ADEA thus requires a showing of "but-for" causation. *See Squyres*, 782 F.3d at 231 (citations omitted).

*Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474-75 (5th Cir. 2015).

[20] Neither Party briefed application of other pretext approaches, such as the "modified *McDonnell Douglas* approach." *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). Thus, the Court pretermits any discussion of other pretext approaches.

**SO ORDERED.**

12th day of December, 2023.

_____

ADA BROWN
UNITED STATES DISTRICT JUDGE